### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZACHARY DEVINE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 21-10129-FDS |
| ) | |
| KILOLO KIJAKAZI, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
### FOR ORDER REVERSING THE COMMISSIONER'S DECISION AND
### DEFENDANT'S MOTION FOR ORDER AFFIRMING COMMISSIONER'S DECISION

**SAYLOR, C.J.**

This is an appeal from the final decision of the Acting Commissioner of the Social

Security Administration denying an application for disability benefits and supplemental security

income ("SSI").[1]  Plaintiff Zachary Devine contends that he became disabled on May 23, 2018,

due to musculoskeletal, mental health, and neurological issues.  He disputes the Commissioner's

decision that he is not "disabled" within the meaning of the Social Security Act.

Devine has moved for an order reversing that decision, and the Acting Commissioner has

cross-moved for an order affirming it.  For the reasons stated below, the Court will grant

plaintiff's motion to reverse the Commissioner's decision and remand for further proceedings,

and the motion to affirm will be denied.

---

[1] The Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, has been substituted as the named defendant pursuant to Fed. R. Civ. P. 25(d).

# I.  Background

The following is a summary of the relevant evidence in the administrative record ("A.R.").

## A.  Education and Occupational History

Zachary Devine was born on August 8, 1991.  (A.R. at 445).  He was 26 years old at the alleged onset of his disability and has not engaged in any substantially gainful activity since then.  (*Id.* at 17, 28).  He has a GED and an HVAC certification.  (*Id.* at 191).

Devine worked from 2008 to 2009 in a hardware store, from 2009 to 2010 as a groundskeeper at a country club, from 2010 to 2011 in fabrication at a stone yard, from 2011 to 2014 at two separate HVAC businesses, from 2014 to 2017 at two separate landscape/hardscape businesses, and for less than one year in a restaurant in 2017.  (*Id.* at 191, 218).  He last reported earnings in 2017.  (*Id.* at 188).

## B.  Medical History

Devine contends that he is unable to work due to multiple musculoskeletal, psychological, and neurological issues.  In addition to the medical history set forth below, he also had an ear avulsion that required a referral for plastic surgery; mild intermittent asthma, for which he was prescribed an albuterol inhaler; allergic and nonallergic rhinitis; and mild myopia.  (*Id.* at 372, 614, 607).

### 1.  Musculoskeletal Health

Devine was injured in an automobile accident on May 23, 2018, after which he received treatment at UMass Memorial Medical Center.  (*Id.* at 413-33).  During his initial evaluation, doctors found that he had a closed right sided displaced iliac wing fracture, a C6 vertebral body fracture with extension into the posterior elements, a C7 vertebral body fracture, a left ninth rib

fracture, and a right-sided L2 transverse process fracture. (*Id.* at 414). A CT angiogram of the neck indicated that the left vertebral artery experienced focal narrowing at C6. (*Id.* at 422). His doctors concluded that he had "painless range of motion about the major joints of the bilateral upper and lower extremities" and could bear weight on both legs. (*Id.* at 415-16).

On May 29, 2018, Dr. Fathyeh F. Marvasti evaluated Devine at the Lahey Clinic. (*Id.* at 355-362). Dr. Marvasti had been Devine's primary-care physician since February 2018. (*Id.* at 290). His assessment noted that Devine had "multiple different level[s]" of neck, lower back, right arm, and right chest pain accompanied by limited movement. (*Id.* at 357).

On May 31, 2018, Dr. Pranatartiharan Ramachandran, a neurosurgeon at Lahey, examined Devine and determined that surgery was not required but asked him to wear a cervical collar pending further imaging and potential spinal fusion. (*Id.* at 365). Dr. Ramachandran saw Devine twice more in August and noted ongoing healing of the fractures in his neck and the ability to move his neck without sharp pain, although he had some restriction when moving his head to the left. (*Id.* at 476, 479).

In total, Devine wore the collar for eleven weeks and then wore a soft collar for comfort. (*Id.* at 475). In September 2018, Dr. Ramachandran noted that while Devine had lingering neck stiffness and soreness, he had no radicular pain and could engage in a full range of neck movement without pain. (*Id.*)

In January 2019, Dr. Brian Jolley, an orthopedist at Lahey, examined Devine for pain in his right knee. (*Id.* at 463, 469). Devine reported that he had historically suffered from issues in both knees but that he was experiencing anterior pain in the right knee that had worsened since the car accident and that the pain was accompanied by a popping sensation and difficulty kneeling and walking up stairs. (*Id.* at 463). After conducting an evaluation and MRI, Dr. Jolley

3

noted that the scan showed impingement on fat pads around Devine's patella and that he had some quadricep atrophy in his right leg, but that his gait was normal. (*Id.* at 459).

In April 2019, Dr. Jolley performed a right knee arthroscopy, medial condyle chondroplasty, and synovectomy. (*Id.* at 702). Colleen Ergin, NP, conducted a post-operative review and noted that Devine's knee was "well-healed" and that he could walk steadily and bear weight "without difficulty," but that he reported difficulty using the stairs and had concerns about his quadricep strength. (*Id.* at 678-80). Dr. Jolley administered a corticosteroid injection to "reduce the effusion and better facilitate physical therapy." (*Id.* at 680).

In May 2019, Dr. Marvasti noted that Devine reported neck pain when moving his head from side-to-side and recommended he undergo physical therapy. (*Id.* at 688). In July 2019, Dr. Ramachandran "reassured [Devine] that the fractures had healed and that the neck pain would definitely get better" and concluded that he did not need to return for a follow-up appointment. (*Id.* at 658).

In October 2019, Devine fell and was concerned that he may have re-injured his right knee. (*Id.* at 631). After an examination, Dr. Jolley determined that the knee had not been re-injured. (*Id.* at 634).

### 2.   Mental Health

Devine has a history of drug abuse predating the alleged onset of his disability and had consumed alcohol the night of his car crash. (*Id.* at 50-51). He was diagnosed with bipolar 1 disorder, for which Dr. Marvasti referred him to a psychiatrist and psychotherapy, in February 2018. (*Id.* at 290, 293). In June 2018, Dr. Marvasti noted that he was anxious but that he hoped to channel his anxiety into motivation, that he was not depressed, and that his previous experiences medicating for his bipolar disorder had been unsuccessful because of side effects.

(*Id.* at 371-72).  The following May, Dr. Marvasti again spoke to him about seeing a psychologist for bipolar disorder.  (*Id.* at 687).

In June 2019, Devine saw Brian Maxfield, LICSW, for bipolar disorder and "significant anxiety."  (*Id.* at 674).  Maxfield noted that Devine reported feelings of depression and past mania but that he rejected medication, and instead they discussed the possibility of psychotherapy.  (*Id.* at 674; 676).  Maxfield diagnosed "generalized anxiety disorder" but listed his mood as "euthymic" and his affect as "appropriate and congruent to content."  (*Id.* at 675-76).

Devine had a neurological consultation with Pritika Patel, NP, in October 2019.  Patel advised him how untreated bipolar disorder in conjunction with postconcussion syndrome could affect his cognition.  (*Id.* at 630).  As of November 2019, Devine was seeing a psychologist every three weeks and was awaiting a psychiatric appointment.  (*Id.* at 604-05).

### 3.    Neurological Health

Although the doctors at UMass Memorial Medical Center indicated that Devine was "neurologically intact" after his accident in May 2018, he continued to complain of various neurological symptoms.  (*Id.* at 424-25).

In May 2018, Dr. Ramachandran found that Devine had normal coordination, strength, sensation, and was not experiencing tremors.  (*Id.* at 364-65).  Dr. Ramachandran speculated that he might require spinal fusion because of his age and the fear that the fractures could "leave him with chronic neck pain."  (*Id.* at 365).

In August 2018, Dr. Ramachandran noted that Devine "has had no imbalance while walking," was at "full strength," had "normally elicitable" reflexes, and had experienced "no dermatomal sensory loss."  (*Id.* at 396).

In January 2019, Devine complained to Dr. Marvasti of daily morning dizziness since the car accident, daily headaches, shaking, and weakness in his right hand that impacted his ability to write. (*Id.* at 467-69). Dr. Marvasti referred him to Dr. Julie Leegwater-Kim. (*Id.* at 461).

Dr. Leegwater-Kim noted that Devine reported he had had a minor hand tremor prior to the accident, and that the accident had rendered him "less cognitively sharp" and "more forgetful and inattentive." (*Id.*). Her evaluation found an "occasional somewhat irregular postural head tremor," a "slight vocal tremor," a "very low amplitude, high-frequency tremor of the arms with posture," and a "similar kinetic tremor of the arms," most likely indicative of an "essential tremor." (*Id.* at 462). Otherwise, Devine was alert and oriented and had appropriate affect, intact language, and an "intact basic fund of knowledge." (*Id.*). Dr. Leegwater-Kim prescribed 60 mg of propranolol daily for the headaches and tremor and ordered an MRI. (*Id.*). The MRI subsequently revealed "two punctate foci of susceptibility blooming most likely representing chronic microhemorrhage" that were considered "most likely posttraumatic" and some nonspecific white matter punctate foci, but nothing acute. (*Id.* at 502-03).

At some point, Dr. Marvasti noted Devine still had daily headaches, that the propranolol helped decrease his hand tremors, but that his right hand still showed a more significant tremor than the left. (*Id.* at 733, 735-36). By May 2019, Dr. Marvasti noted that "overall," Devine was "much better both physically and emotionally since the accident" but that his daily headaches and tremors persisted. (*Id.* at 689-90). Accordingly, she increased his propranolol prescription from 60 to 80 mg. (*Id.*).

In June 2019, Ms. Patel evaluated Devine for his tremor. (*Id.* at 662). Ms. Patel observed the tremor and noted that Devine reported being "less cognitively sharp" and "more forgetful and inattentive" since the accident, although the February MRI did not reveal any

significant issues.  (*Id.* at 662-63).

In July 2019, Devine complained to Dr. Marvasti that his bilateral tremors and twitching affected his ability to perform tasks such as threading a needle and taking photographs.  (*Id.* at 651).  In September 2019, he saw Dr. Marvasti twice after falling off a barrel while on vacation. (*Id.* at 639, 646, 781).  At those appointments, he complained of headaches that had persisted since the accident, dizziness, and tremors.  (*Id.* at 635-40, 646).

Ms. Patel saw Devine again in October 2019. (*Id.* at 628-30).  They discussed his neurological issues in addition to post-concussion syndrome, and Ms. Patel advised him to take medication for his bipolar disorder before beginning migraine medication.  (*Id.*).

In November 2019, Dr. Marvasti noted tremors, bilateral hand numbness, decreased hand sensitivity to texture and temperature, headaches, and visual limitations from his concussion. (*Id.* at 603-04).  She also noted that the tremor was "much better" and "minor," indicating that it was, for the most part, "controlled" on the propranolol.  (*Id.* at 604-05).

### C.    Residual Functional Capacity Assessments and Related Opinions

On November 26, 2019, Dr. Marvasti completed a residual functional capacity ("RFC") form concerning Devine.  (*Id.* at 590-599).  She determined that he had the following exertional limitations:  occasionally or frequently lift and/or carry less than ten pounds, stand and/or walk for less than two hours in an eight-hour workday, sit for less than six hours in an eight-hour workday, limited pushing and/or pulling in the upper extremities.  (*Id.* at 593).  Those conclusions were based in part on his cervical and lumbar vertebral fractures, injury to his right knee, and his head injury leading to dizziness and memory loss.  (*Id.*).  As to postural limitations, she concluded that he should never climb, balance, stoop, kneel, crouch, or crawl because of his right knee, dizziness, tremors, and more.  (*Id.* at 594).  With respect to manipulative limitations,

she indicated that he was limited as to reaching in all directions, handling, fingering, and feeling because of the fractures in his cervical spine not healing completely, his concussion, and his tremor. (*Id.* at 595). She listed visual limitations related to near acuity, far acuity, and color vision due to his concussion. (*Id.*). She listed no communicative limitations and reported environmental limitations for extreme cold, noise, vibration, and hazards due to his concussion and cervical fractures. (*Id.* at 596). Overall, she concluded that his symptoms were attributable to medically determinable impairments and that the severity of those symptoms was consistent with the impairments. (*Id.* at 597).

In February 2019, Dr. Marvasti completed the paperwork for Devine to participate in a DTA medical assistance program. (*Id.* at 581-86). In her report, she noted neck pain, decreased range of motion, headaches, right knee pain and limited movement, bilateral tremors (the right being more severe), bipolar disorder, and anxiety. (*Id.* at 585). Although she indicated that his chronic condition was likely to improve, when asked when that improvement would likely occur, she wrote "unknown." (*Id.*). She noted that his impairments affected his ability to work and were expected to last for more than a year. (*Id.* at 586).

Dr. Fizzeh Nelson-Desiderio, a state-agency physician, assessed Devine on December 6, 2018. (*Id.* at 72-79). She did so without a consultative evaluation. (*Id.* at 75). After a telephone call with Devine, Dr. Nelson-Desiderio observed that he "seem[ed] to be somewhat confused" and had "some difficulties concentration, and answering some general questions due to lack of memories." (*Id.*). In her report, she noted #8290, "other fracture of bones," and #7240, "spine disorders," as his severe impairments and considered Listing 1.04 (spine disorders). (*Id.* at 76). She concluded that his pain could be reasonably produced by his medically determinable impairments and that his statements about the intensity, persistence, and functionally limiting

effects of his symptoms were substantiated by the objective medical evidence. (*Id.* at 76-77). She then listed his exertional limitations as occasionally lifting and/or carrying up to 20 pounds and frequently lifting and/or carrying up to ten pounds but noted that he could perform unlimited pushing and/or pulling. (*Id.* at 77). She concluded he could stand or walk for approximately six hours in an eight-hour workday, if provided normal breaks, and could sit for the same period. (*Id.*). She found no postural, manipulative, visual, communicative, or environmental limitations. (*Id.*). In her explanation, she mentioned his fractures from the accident, daily activities, weakness, daily headaches, pain during extended periods of sitting, limited neck mobility, issues bending, and anti-inflammatory meds. (*Id.* at 77-78). Finally, she decided that based on her assessment of his seven strength factors, such as his lifting capacity, his maximum sustained work capacity was "light." She found him, however, to not be disabled. (*Id.* at 79). She listed three jobs with significant numbers in the national economy she believed Devine could perform: winder, electronic worker, and encapsulator. (*Id.*).

On February 14, 2019, in connection with the reconsideration of his claim, state-agency physician Dr. Subbiah Doraiswami performed an assessment. (*Id.* at 93-101). Like Dr. Nelson-Desiderio, Dr. Doraiswami based her assessment on Devine's medical record and a telephone conversation. (*Id.* at 97). She noted that he explained that his medical condition had changed due to knee pain. (*Id.* at 94). After speaking to him on the telephone, Dr. Doraiswami reported that he had told her he was neither in treatment nor taking medication, other than marijuana, for his bipolar disorder, and that his physical conditions prevented him from working. (*Id.* at 96). Specifically, she noted that he had his mental health "controlled" and did not wish to have it considered for his disability claim. (*Id.* at 96-97). In her reconsideration analysis, she noted various aspects of his medical record from January through September 2019. (*Id.* at 97). She

listed the same severe impairments, considered the same spine disorder Listing (1.04), and reported the same exertional limitations that Dr. Nelson-Desiderio had.  (*Id.* at 97-99).  She agreed that Devine's pain could be reasonably produced by his medically determinable impairments and that his statements about the intensity, persistence, and functionally limiting effects of his symptoms were substantiated by the objective medical evidence.  (*Id.* at 98).  Unlike Dr. Nelson-Desiderio, however, Dr. Doraiswami reported that Devine did have manipulative limitations that restricted the handling and fingering of his right hand due to his tremor. (*Id.* at 99).  She noted that there were "minor changes made to initial RFC" but still concluded that he could perform "light" work, listed the same three jobs he could perform that Dr. Nelson-Desiderio had listed, and determined that he was not disabled.  (*Id.* at 100-01).

### D.    Procedural Background

Devine applied for supplemental security income on June 4, 2018, and disability benefits on June 6, 2018.  (*Id.* at 175-81).  He claimed that he was disabled from medical complications arising out of the automobile accident on May 23, 2018.  (*Id.*).

His applications were denied on December 10, 2018, and he requested reconsideration on January 22, 2019.  (*Id.* at 103, 106, 111).  On February 14, 2019, his applications were once again denied.  (*Id.* at 113, 116).  He then requested a hearing, which was held on January 24, 2020.  (*Id.* at 119, 137).  Devine and Rocco Meola, a vocational expert, appeared and testified at the hearing.  (*Id.* at 38).  On March 6, 2020, the ALJ concluded that he was not disabled.  (*Id.* at 12-29).  The Appeals Council denied his request for review on December 2, 2020.  (*Id.* at 1).

This appeal followed.

II.     **Analysis**

A.      **Standard of Review**

Under the Social Security Act, this Court may affirm, modify, or reverse the final

decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C.

§ 405(g).  The ALJ's factual findings, "if supported by substantial evidence, shall be

conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable

minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ."

*Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001) (citation omitted); *see Evangelista v.*

*Secretary of Health & Hum. Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  The ALJ's factual

findings are supported by substantial evidence "if a reasonable mind, reviewing the evidence in

the record as a whole, could accept it as adequate to support his conclusion."  *Rodriguez v. Sec'y*

*of Health & Hum. Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).  "Judicial review of a Social

Security Claim is limited to determining whether the ALJ used the proper legal standards and

found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652,

655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision when the ALJ ignored

evidence or made legal or factual errors.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)

("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the

law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D.

Mass. Mar. 2, 2013) (citation omitted) ("[I]f the ALJ made a legal or factual error, the Court may

reverse or remand such decision . . . .").  Accordingly, if the "ALJ failed to record consideration

of an important piece of evidence that supports [the claimant's] claim and, thereby, left

unresolved conflicts in the evidence, [the] Court cannot conclude that there is substantial

evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation."). Questions of law are reviewed *de novo*. *Seavey*, 276 F.3d at 9.

**B.      Standard for Entitlement to SSDI Benefits**

An individual is not entitled to social security disability insurance ("SSDI") benefits or SSI benefits unless he or she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(d) (setting forth the definition of disabled in the context of SSDI); 42 U.S.C. §§ 1382c(a)(1), 1382c(a)(3)(A) (same in the context of SSI). "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than" 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe enough to prevent a claimant from performing not only past work, but also any substantial gainful work existing in the national economy. *See* 20 C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).  "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001) (citation omitted).  At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether the claimant can "engage in any . . . kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

### C.    The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the established five-step procedure set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a)(4).  (A.R. at 16).

At Step 1, the ALJ determined that Devine had not engaged in substantial gainful activity during the period since his alleged disability onset date of May 23, 2018.  (*Id.* at 17).

At Step 2, the ALJ addressed the severity of his impairments.  (*Id.* at 16).  He concluded that Devine had the following severe impairments:  cervical and lumbar spine closed fracture, right iliac wing avulsion fracture, and status post right knee arthroscopic surgery.  (*Id.* at 17). Those impairments significantly limited his ability to perform basic work activities as required by SR-85-28.  (*Id.* at 18).

At Step 3, the ALJ determined that his "severe impairments" did not meet or medically equal the requirements of a Listed Impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 20); *see also* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.  The ALJ assessed his impairments under Listings 1.04 (spinal disorders), 1.02 (major dysfunction of a joint), 1.06 (fracture of the femur, tibia, pelvis, or one or more of the tarsal

bones), and 1.07 (fracture of an upper extremity).  (*Id.* at 20-21).  After considering the objective

medical evidence, the ALJ found that (1) Devine's spinal fractures did not meet the criteria

required under Listing 1.04; (2) his right iliac avulsion fracture did not meet the criteria of

Listing 1.02, (3) there was no other evidence of any major dysfunction of a joint, and (4) there

was no medical evidence indicating a fracture that satisfied Listing 1.06 or 1.07.  (*Id.* 20-21).[2]

At Step 4, the ALJ determined that Devine's RFC precluded him from performing any

past relevant work as a landscaper or stone setter, but that he had the RFC to perform a "light"

level of work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  (*Id.* at 28-29).  The ALJ

noted that he did not "assign a weight to any medical opinion" but he found particularly

persuasive the statements by Drs. Nelson-Desiderio and Doraiswami that "claimant can lift/carry

and push/pull up to 20 pounds occasionally and 10 pounds frequently, and sit and stand/walk for

6 hours each in an eight-hour workday," because they were supported by the medical evidence in

the record and were consistent with one another.  (*Id.* at 27) (internal quotation marks omitted).

The ALJ did not find persuasive Dr. Doraiswami's opinion concerning manipulative limitations,

as "the treatment notes indicate that claimant's tremors responded well to medication."  (*Id.*).

Finally, the ALJ found Dr. Marvasti's opinions "minimally persuasive," because the RFC and

Dr. Marvasti's office notes were inconsistent, both with each other and with the medical record,

and additional notes were "vague as to specific limitations."  (*Id.*).

At Step 5, the ALJ considered Devine's age, education, work experience, and RFC.  (*Id.*

at 28).  The vocational expert testified that given his age, education, work experience, and RFC

---

[2] Listings 1.02, 1.04, 1.06, and 1.07 have been replaced in the Code of Federal Regulations following a
revision that went into effect on April 2, 2021, after this case was filed.  20 C.F.R. § 404, Subpt. P, App. 1.
However, the revision does not affect this Court's analysis, because "[a]s a general matter, 'administrative rules will
not be construed to have retroactive effect unless their language requires this result.'"  *Coskery v. Berryhill*, 892
F.3d 1, 4 (1st Cir. 2018) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

he "would be able to perform the requirements of the entire light and sedentary vocational bases." (*Id.*).  However, the vocational expert testified that if his capacity were limited to "handling and fingering with the right upper extremity to occasional," then "he would not be able to do any of the light or sedentary unskilled work."  (*Id.* at 53).  Pursuant to SSR 00-4p, the ALJ determined that the vocation expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles.  (*Id.* at 29).  Accordingly, the ALJ found that Devine could make a successful adjustment to other work that exists in significant numbers in the national economy and was therefore not disabled within the meaning of the Social Security Act. (*Id.*).

Based on those findings, the ALJ concluded that Devine did not suffer from a disability and was not eligible to receive either disability insurance benefits or supplemental security income under §§ 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act.  (*Id.* at 29).

### D.      Plaintiff's Objections

Devine contends that the ALJ erred because (1) the ALJ did not properly compare his severe impairments to the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (2) the ALJ did not properly weigh the medical source opinions of his treating physician; (3) his ability to perform daily activities should not have factored into the analysis; (4) contrary to the ALJ's RFC finding, he cannot perform light work; (5) he is not, in fact, capable of performing any work, and (6) the ALJ did not refer to the vocational expert's entire testimony in his decision.

### 1.      Inadequate Evaluation of the Record

First, Devine contends that his impairments meet the criteria of Medical Listings 1.02, 1.04, 12.06, and 11.00(D)(1) and (D)(2), rendering him disabled *per se*.  If the impairments meet

a "listing," the claimant is deemed "disabled" without any further analysis of the claimant's residual functional capacity to perform past relevant work or other work in the national economy.  20 C.F.R. § 404.1520(d); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) ("The listings are so constructed that an individual with an impairment(s) that meets or is equivalent in severity to the criteria of a listing could not reasonably be expected to do any gainful activity."); 20 C.F.R. § 404.1525(a). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  The evidence must be based on objective observations during examinations and established by a record of ongoing management and evaluation.  20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.00D.  The claimant bears the burden of proof as to that issue.  *See Freeman*, 274 F.3d at 608.

### a.      Listings 1.02 and 1.04:  Major Dysfunction of a Joint and Spine Disorders

Devine contends that the sum of his back and joint injuries, in combination with his "chronic pain syndrome," qualify him as disabled under listings 1.02 and 1.04.  In support, he cites 20 C.F.R. § 404.1529(c).  However, that regulation concerns the evaluation of symptoms in determining a claimant's capacity to work, not the question of whether a claimant satisfies the criteria for a specific listing.  While "[p]ain or other symptoms may be an important factor contributing to a functional loss," the medical evidence must first establish that there has been a functional loss.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(d).

Here, the ALJ reasonably determined that the objective examination findings failed to satisfy listing 1.04.  He found that

there was no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight-leg raising, or spinal arachnoiditis, or lumbar spinal

16

stenosis resulting in pseudoclaudication . . . . [or] spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia.

(A.R. at 21).  That decision is supported by the results of a July 2019 CT scan, which indicated that there was no spinal canal or neural foraminal narrowing.

In addition, the ALJ reasonably concluded that the objective findings failed to meet listing 1.02.  He concluded that

there was no evidence of a gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint with involvement with both upper extremities, resulting in the inability to perform fine and gross movements effectively.

(*Id.*).  That decision was supported by the opinions of multiple physicians, who noted that Devine could ambulate without issue.

### b.      Listing 12.06:  Anxiety and Obsessive-Compulsive Disorders

Devine next contends that the ALJ should have considered whether his anxiety and obsessive-compulsive disorders satisfied listing 12.06.  Step 2 requires that the ALJ determine whether an impairment is "severe" before considering whether it qualifies under a defined listing.  An impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522.

Here, the ALJ determined that Devine's mental impairments were not severe.  (A.R. at 19).  In reaching that determination, the ALJ considered his "predominantly normal mental examination," his "manageable" symptoms, his report that "he was not interested in medication for his bipolar disorder" and the fact that he did not list mental-health impairment in his Disability Report Forms.  (*Id.*).  Because the ALJ reasonably concluded that Devine's mental-health impairment was not severe under Step 2, he did not err when he declined to consider

whether Devine's mental health satisfied a listing under Step 3.

### c.    Listing 11.00:  Neurological Disorders

Finally, Devine contends that the ALJ should have considered whether his neurological disorders satisfied listings 11.00(D)(1) and 11.00(D)(2).  As with the disorders discussed above, the ALJ considered his neurological impairments under Step 2 and determined that his hand tremors "predate his alleged onset date and are 'congenital.' They are noted as minor, and controlled with metapropolol.  As such, they are non-severe."  Because the ALJ reasonably concluded that Devine's neurological disorders were not severe under Step 2, he did not err when he declined to consider whether Devine's neurological disorders satisfied a listing under Step 3.

### 2.    Medical Source Opinions

### a.    Dr. Marvasti

Devine next contends that the ALJ should have given controlling weight to the opinions of his treating physician, Dr. Marvasti.  In support of that contention, he cites  the "Treating Source Rule" defined by 20 C.F.R. § 404.1527, which requires the ALJ to give more weight, and sometimes controlling weight, to the opinion of a treating source.  However, § 404.1527 is only effective for claims filed before March 27, 2017.  For claims that were filed on or after March 27, 2017, § 404.1520c applies.

Under § 404.1520c, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  When determining what weight to assign to a medical source opinion, the ALJ must consider the opinion's "supportability, consistency, relationship, specialization, and other factors."  *Harrison v. Saul*, 2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021) (citing C.F.R. §§ 404.1520c(c)(1)-(5),

416.920c(c)(1)-(5)).  "The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate."  *Id.* (citation omitted).  "ALJs must consider the persuasiveness of all medical opinions in a claimant's case record and need not defer to the medical opinions of a claimant's treating physicians."  *Id.* (citing 20 C.F.R. § 404.1520c).  This means that "[a] medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion."  *Id.* (quoting REVISIONS TO RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. at 5854).  "An ALJ's decision to accord a treating physician's opinion with little weight will be sustained on review so long as one of the reasons given by the ALJ is proper and adequately supported."  *Id.* at *6 (citations omitted).

Here, the ALJ found each of Dr. Marvasti's opinions to be "minimally persuasive."  He noted that in one of her two November 26, 2019 reports, Dr. Marvasti opined that Devine could "frequently lift/carry less than 10 pounds; stand/walk for less than 2 hours and sit for less than 7 hours in an eight-hour workday" whereas in the other, she opined that Devine "cannot lift even 5 pounds, that he has pain in his right knee and lower back after 15 minutes; [and] can sit for 20 minutes due to headache . . . ."  (A.R. at 27).  The ALJ found both opinions to be "minimally persuasive" because they were "inconsistent with each other and inconsistent with the treatment records."  (*Id.*)  He further found that Dr. Marvasti's February 26, 2019 report that Devine "had cervical pain, decreased range of motion and headaches, right knee pain and limited range of motion tremors in his bilateral hands" was "vague as to specific limitations, and [reached] a conclusion reserved to the Commissioner."  (*Id.*)

The ALJ's determination that Dr. Marvasti's November 26, 2019 opinions were not consistent with one another is not supported by the record.  The first opinion was an RFC report that required Dr. Marvasti to select from a variety of restriction options.  She selected the most conservative options available:  frequently lift/carry less than 10 pounds; stand/walk for less than 2 hours and sit for less than 7 hours in an eight-hour workday.  (*Id.* at 593).  Her second opinion was in the form of office notes that reflect her more specific determination that Devine "cannot lift even 5 pounds due to neck pain" and standing and walking was limited to 10-15 minutes and sitting to 20 minutes due to pain.  (*Id.* at 604).  In context, those opinions are not inconsistent, as the restrictions reflected in Dr. Marvasti's office notes are encompassed by the broader restrictions reflected in the RFC report.

Nonetheless, the ALJ's determination that Dr. Marvasti's opinions were inconsistent with the medical record is supported by the evidence.  As noted by Dr. Marvasti, the cervical and spinal fractures were "closed" and exhibited "routine healing," findings that were supported by Dr. Ramachandran.  (*Id.* at 605; 658).  Similarly, Devine's knee was "well-healed" after his surgery, and he could bear weight "without difficulty."  (*Id.* at 678-80).  Accordingly, the ALJ did not clearly err in discounting Dr. Marvasti's opinions as to Devine's restrictions on lifting/carrying, standing/walking, and sitting.

The ALJ likewise did not clearly err in discounting Dr. Marvasti's third opinion, which was given in connection with the application for Massachusetts Department of Transitional Assistance dated February 20, 2019.  (*Id.* at 581).  The ALJ explained that it was "vague as to specific limitations" and there was "little support in the record for any cognitive impairments." (*Id.* at 27).  Dr. Marvasti's report lists Devine's symptoms but does not provide any medical bases for them.  Accordingly, the ALJ provided adequate reasons for discounting that opinion.

**b.** **Dr. Nelson-Desiderio and Dr. Doraiswami**

The ALJ found "persuasive" the exertional requirements listed by state-agency physicians Dr. Nelson-Desiderio and Dr. Doraiswami, who opined that Devine could lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently and sit and stand/walk for 6 hours each eight-hour workday. (*Id.* at 27; 77; 98-99). The ALJ found that those opinions were persuasive because they were "supported by the treatment records of the Lahey Clinic" and consistent with each other. (*Id.* at 27). As the medical records indicate that Devine's cervical and spinal fractures had healed and his knee was weight-bearing, the ALJ did not err in crediting those opinions.

However, the ALJ found that Dr. Doraiswami's opinion as to Devine's manipulative limitations was not persuasive. Dr. Doraiswami opined that "[d]ue to right hand tremor limited handling/fingering to occ[asional] is reasonable." (*Id.* at 88, 99). The ALJ found that this was not supported by the medical record, because "the treatment notes indicate that claimant's tremors responded well to medication." (*Id.* at 27). That conclusion, in this context, at least, requires a more complete explanation. In January 2019, Dr. Leegwater-Kim prescribed 60 mg of propranolol per day which, Dr. Marvasti noted, helped reduce but not eliminate the tremor. (*Id.* at 462, 689-90). In May 2019, Dr. Marvasti increased the prescription from 60 to 80 mg. (*Id.* at 689-90). By November 2019, Dr. Marvasti examined the tremor and noted that it was "much better" and "minor" but that Devine reported at times it worsened. (*Id.*) Devine also reported "tingling and numbness on the tip of the fingers." (*Id.*) According to those notes, although Devine responded well to medication, the medication did not eliminate the tremor. Therefore, Dr. Doraiswami's opinion regarding Devine's manipulative limitations appears to be consistent with the medical record and with Dr. Marvasti's opinions. In light of the imposition of that

conclusion, at a minimum, the ALJ should have provided an adequate explanation for his reasoning.

Finally, Devine contends that the opinions of both Dr. Nelson-Desiderio and Dr. Doraiswami should be discredited because they only relied on his medical records through September 2018, despite the fact that his treatment continued through November 2019, and because they never examined him. The First Circuit has held that the opinion of a non-examining consultant cannot serve as substantial evidence if it is "based on a significantly incomplete record, and it [is] not well justified because it fails to account for a deterioration in the claimant's condition." *Alcantara v. Astrue*, 257 Fed. Appx. 333, 334 (1st Cir. 2007) (per curiam). That is not the case here. Although Dr. Nelson-Desiderio reviewed Devine's claim in 2018 prior to his knee surgery, Dr. Doraiswami reviewed his claim in 2019 and specifically referred to his knee condition in her analysis. (A.R. at 97). Furthermore, deference is no longer given to a treating physician over a non-examining consultant. 20 C.F.R. §§ 404.1520c(c)(3)(v).

Accordingly, the ALJ provided adequate explanation for his conclusions as to the medical source opinions, with the exception of his decision to discredit Dr. Doraiswami's and Dr. Marvasti's opinions concerning Devine's manipulative limitations. Remand is therefore appropriate as to that issue.

### 3.   Claimant's Daily Activities

While testimony concerning a claimant's daily activity is not, on its own, sufficient evidence for a finding of "not disabled," an ALJ may validly consider it in his credibility finding. *Blackette v. Colvin*, 52 F. Supp. 3d 101, 121 (D. Mass. 2014); *Teixeira v. Astrue*, 755 F.Supp.2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily

activities can be used to support a negative credibility finding.").  Indeed, it is listed as the first

factor relevant to determining a claimant's symptoms in the regulation itself.  20 C.F.R. §

404.1529(c)(3)(i).  The court in *Avery v. Secretary of Health and Human Services* explained that

> when there is a claim of pain not supported by objective findings, the adjudicator
> is to obtain detailed descriptions of daily activities by directing specific inquiries
> about the pain and its effects to the claimant, his/her physicians from whom
> medical evidence is being requested, and other third parties who would be likely
> to have such knowledge. Further, it is essential to investigate all avenues
> presented that relate to subjective complaints.

797 F.2d 19, 23 (1st Cir. 1986) (internal quotation marks omitted).

Here, the ALJ appropriately considered Devine's reports concerning his daily activities

when determining his RFC.  Devine's argument relies on cases where the ALJ inappropriately

considered the claimant's description of daily living at Step 3 as part of an analysis of medical

source opinions.  *See Soto-Cedeño v. Astrue*, 380 F. App'x 1, 2-3 (1st Cir. 2010); *Lemieux v.

Berryhill*, 323 F. Supp. 3d 224, 230 (D. Mass. 2018).  Here, however, the ALJ considered

Devine's daily activities as part of Step 4.  Accordingly, there was no error.

### 4.    <u>Residual Functional Capacity Finding</u>

Devine makes three challenges to the ALJ's Step 4 RFC determination:  he contends that

(1) Dr. Marvasti's opinion was erroneously considered to be insufficiently persuasive, (2) Dr.

Doraiswami's opinion concerning his tremor was erroneously considered to be insufficiently

persuasive, and (3) the ALJ did not properly explain or support his finding that the intensity and

persistence of his symptoms were not substantiated by the objective medical evidence.  Devine's

first two arguments are discussed above, and therefore this section will only consider the third

question.

An ALJ's determination of a claimant's RFC must be supported by substantial evidence.

*Seavey*, 276 F.3d at 9.  Substantial evidence means that there is "more than a mere scintilla" of

23

evidence, such that a reasonable mind could accept the evidence as "adequate to support" the ALJ's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).

"Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 430 (1st Cir. 1991). An ALJ's conclusion as to RFC must be supported by a "medical opinion" to be supported by substantial evidence. *See Chater*, 172 F.3d at 35 (holding that "[a]s a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination"); *see also Beyene v. Astrue*, 739 F. Supp. 2d 77, 83 (D. Mass. 2010) (holding that an ALJ's "determination of a claimant's RFC made without any assessment of RFC by an expert is unsupported by substantial evidence and must be remanded to obtain further functional evidence"). A medical opinion is a statement from a medical source about what an individual can do despite his or her impairments. 20 C.F.R. § 404.1513(a)(2). If the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court cannot conclude that there is substantial evidence in the record to support the Commissioner's decision." *Callahan*, 997 F. Supp. at 183; *see also Crosby*, 638 F. Supp. at 385-86.

Here, the ALJ determined that Devine's symptoms could be reasonably expected to flow from his impairments but that their intensity, persistence, and limiting effects, as he described them, were not consistent with the medical record. (A.R. 23). However, the ALJ did not find the opinions of Dr. Doraiswami and Dr. Marvasti as to the hand tremor to be persuasive, and the evidentiary basis for that conclusion is not clear. *See Chater*, 172 F.3d at 35; *Callahan*, 997 F.

Supp. at 183.  Moreover, the ALJ did not explain why Dr. Nelson-Desiderio and Dr. Doraiswami concluded that Devine's "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone," as he reached the opposite conclusion.  Because "[the] Court cannot conclude that there is substantial evidence in the record to support the Commissioner's decision," under the circumstances, remand is appropriate.  *Callahan*, 997 F. Supp. at 183.

### 5.   Plaintiff's Ability to Perform Other Work and the Vocational Expert Testimony

At Step 5, the ALJ must identify the types of jobs the claimant could perform notwithstanding his disabilities and ascertain whether those kinds of jobs exist in significant numbers in the national economy.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019).  The ALJ must consider the claimant's RFC along with "the vocational factors of age, education, and work experience, as appropriate."  20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).  This step incorporates the RFC identified at Step 4 and often the opinion of a vocational expert.  20 C.F.R. § 404.1560(c)(2); *Biestek*, 139 S. Ct. at 1152.  Because this case will be remanded, there is no need for the Court to address this issue at this stage.  *Perez v. Kijakazi*, No. 19-CV-11444-ADB, 2021 WL 4869949, at *5 (D. Mass. Oct. 19, 2021).

## III.   Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final decision of the Commissioner of the Social Security Administration is GRANTED, and the Commissioner's motion to affirm the action is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Dated:  September 12, 2022          Chief Judge, United States District Court